# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA
### CHARLOTTESVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| *Plaintiff*, | CASE NO. 3:16-cv-00083 |
| v. | |
| COUNTY OF CULPEPER, VIRGINIA, | MEMORANDUM OPINION |
| *Defendant.* | JUDGE NORMAN K. MOON |

In 2016, the Islamic Center of Culpeper (ICC) wished (and still wishes) to build a mosque. Local health authorities told the ICC its building site would not support normal septic methods, so it needed a special permit from the County. Historically, such permits were granted as a matter of course, with little fanfare or scrutiny. Officials even called the matter "routine" and stated publicly that the ICC's application satisfied state law and the County's protocols. Nevertheless, the County denied the application.

For now, the Court has before it only allegations, not evidence. Allegedly, though, the County first delayed a hearing on the ICC's application. During the delay, a few officials openly worried that the application was being subjected to an unusual, heightened degree of scrutiny. At the same time, local citizens got wind of the ICC's plan to build a mosque and began pressuring County officials to deny the permit. Some of these communications (both prior to and during the subsequent public hearing) supposedly contained unabashed anti-Muslim sentiments. Ultimately—despite the County Administrator's conclusion that the ICC's application met state and local requirements, and notwithstanding that the County granted every similar application over the last quarter-century—the County's Board of Supervisors ("Board") denied the permit by a 4-to-3 vote, drawing applause from the audience at the hearing.

Based on these allegations, the United States of America filed this lawsuit against the County for violating RLUIPA—the Religious Land Use and Institutionalized Persons Act. That statute forbids land use laws that (1) discriminate against a group because of its religion, or (2) substantially burden religious exercise, unless there is (in layman's terms) an extremely good, narrowly-crafted reason for doing so. *See* 42 U.S.C. §§ 2000cc-(a), (b)(2).

The County has moved to dismiss the lawsuit. But the facts alleged leave the impression that the County's permit denial was based on religious hostility, and that the denial substantially burdened the ICC's ability to exercise its religion. And although the County contends that RLUIPA's protections do not apply to its permit process, several points indicate otherwise: the text of RLUIPA, precedent from the Fourth Circuit and other courts, the structure of the County's own laws, and how the permit process was (allegedly) used here to restrict property that otherwise allowed religious uses as of right. For these reasons, the Court will deny the County's motion to dismiss.

## STANDARD OF REVIEW

The County primarily argues that the allegations in the Complaint do not amount to a violation of the law. When evaluating this type of motion to dismiss, the Court must accept as true all well-pled allegations. *See Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527, 539 (4th Cir. 2013); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotation marks omitted). Stated differently, in order to survive a motion to dismiss, "a complaint must contain sufficient

– 2 –

factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). The Court disregards the Complaint's legal conclusions and arguments. *Iqbal*, 556 U.S. at 578–79.

The County also asserts this Court lacks jurisdiction because the case is not ripe for decision. When a motion to dismiss is made pursuant to Rule 12(b)(1), the plaintiff bears the burden of proving his assertion of subject-matter jurisdiction. *See The Piney Run Pres. Ass'n v. The Cty. Comm'rs Of Carroll Cty., MD*, 523 F.3d 453, 459 (4th Cir. 2008). In a facial challenge to subject-matter jurisdiction, like the one asserted here, the "defendant contends that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based. Accordingly, the plaintiff is afforded the same procedural protection as she would receive under" the Rule 12(b)(6) legal standard, discussed above. *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (internal citations and quotations omitted).

## FACTS AS ALLEGED

### The ICC and Its Religious Needs

The ICC is a non-profit, religious organization centered around Islam. (Complaint ¶¶ 22–23). ICC members adhere to several religious beliefs and practices. For instance, members are religiously required to: pray five times daily; wash their hands and feet before prayer in a sacred ritual called abulation or wudu; and attend a Friday religious service. (*Id.* ¶ 23).

The ICC is, and always has been, without a mosque. (Complaint ¶ 25). None exists in Culpeper County, and driving to an existing mosque is simply infeasible. (*Id.* ¶ 25). The nearest mosque is approximately 45 minutes away, meaning ICC members would have to travel by car almost eight hours round-trip every day to attend the five, religiously required daily prayer sessions. (*See id.* ¶ 25).

– 3 –

Consequently, ICC members currently worship at a small, single-room house in Culpeper County. (Complaint ¶¶ 26–27). The house fails to meet the membership's religious needs. It is too small to host large gatherings on significant religious holidays and celebrations. (*Id*. ¶ 27). It does not have separate worship facilities for women, which conflicts with the ICC's beliefs. (*Id*.). There is no dedicated space for studying religious texts, so classes are often interrupted by other activities. (*Id*.). And the house lacks an adequate washing facility, so most congregants perform adulation at their own homes. (*Id*.).

Facing these problems, the ICC undertook a multiyear search for suitable property to purchase and on which to build a mosque. (Complaint ¶ 28). The members' faith does not permit borrowing money at interest, a belief applying with special force to the construction of a mosque. (*Id*. ¶ 24). That belief, along with the lack of affordable land in a central location within the County, made finding a suitable property difficult. (*Id*. ¶¶ 24, 28). Yet on January 19, 2016, the ICC signed a contract for a one-acre tract in Culpeper County ("the Property"); the land is zoned for residential use and allows religious uses as of right. (*Id*. ¶¶ 14, 29).

**The ICC's Initial Pump-and-Haul Application and Subsequent Delay**

Also in January 2016, the ICC's Director, Mohammad Nawabe, asked the County's Planning and Zoning Department for information about the Property. (Complaint ¶ 32). The County Planning Director encouraged Nawabe to contact the local health department about the Property's soil conditions, which Nawabe did. (*Id*. ¶¶ 33–34). The health department informed Nawabe that the Property's poor soil would not support traditional septic systems, so the ICC needed to apply for a pump-and-haul permit from the County. (*Id*. ¶ 35). The health department provided Nawabe with two letters regarding the Property's poor soil conditions. (*Id*.).

A pump-and-haul permit is used when municipal sewers cannot service a property and

– 4 –

the local soil cannot effectively support a septic system. (Complaint ¶ 16). Accordingly, sewage is held in a tank on-site, then periodically pumped out and hauled away by truck to a treatment plant. (*Id*. ¶ 16). Pump-and-haul permits are a creature of state law and issued by the Virginia Department of Health. (*Id*. ¶ 17). But any "permanent" pump-and-haul operation—meaning one lasting longer than a year—must be done under supervision of a local governmental entity rather than a private actor. (*Id*. ¶ 17; *see* 12 Va. Admin. Code § 5-610-599). The Culpeper County government is the only holder of a permanent pump-and-haul permit in Culpeper County, so one must receive the Board's approval to be added to its permit. (Complaint ¶¶ 18–19; *see* 12 Va. Admin. Code § 5-610-599.3).[1] The Board exercises complete discretion over that decision. (Complaint ¶ 20). But from 1992 to 2016, the Board considered 26 applications for commercial or religious use (including nine for churches) and granted them all. (*Id*. ¶ 21).

Around February 8, 2016, Nawabe paid a processing fee and submitted a pump-and-haul application to the County on behalf of the ICC, which included the two letters from the health department. (Complaint ¶ 36). The application indicated that the Property would be used for "praying and meetings" and that the Property's soil could not support a traditional septic system. (*Id*. ¶ 36). The application was scheduled for a hearing before the County's Board of Supervisors ("Board") on March 1, 2016. (*Id*. ¶ 37).

Two days prior to the meeting, "well-known civic leader" Kurt Christensen emailed certain Board members, the County Administrator, and local media outlets about the application. He wrote that the ICC "wishes to rehabilitate the existing home [on the Property] and use it on a weekly basis as a place of prayer…………Hmmmmmmmmm" and asked the Board to "please pull

---

[1]     Apparently, even if an applicant desires a temporary pump-and-haul permit, it must still obtain the "concurrence of the local political subdivision," in addition to meeting other requirements. 12 Va. Admin. Code § 5-610-440.

– 5 –

this item from the March meeting agenda and give citizens a detailed briefing pronto." (Complaint ¶ 38). The County Administrator subsequently emailed the County Attorney, saying "we should discuss this today." (*Id.* ¶ 39). The County Attorney then stated at the March 1 meeting that she needed more time to review the ICC application. The Board granted a delay, which was a break from prior practice because historically the County Attorney did not review such applications. (*Id.* ¶¶ 40, 41).

### The ICC's Second Application and the Board's Vote

After the March 1 meeting and at the County Planning Director's request, Nawabe met with the Director, the County Administrator, and Board Chairwoman Alexa Fritz to discuss the pump-and-hall application. (Complaint ¶¶ 42–43). At the meeting, the Director provided Nawabe with a new permit application because the previous one was ostensibly outdated, and the County Administrator and Chairwoman Fritz assured Nawabe that the permit was a routine matter. (*Id.* ¶ 44). Nawabe promptly resubmitted the application, which was scheduled for a hearing at the Board's April 5, 2016 meeting. (*Id.* ¶¶ 45–46).

Prior to the April 5 meeting, the County received many emails and phone calls from citizens about the ICC's application, and allegedly "[m]uch of the opposition" contained disparaging anti-Muslim comments, such as references to terrorism and the September 11, 2001 terrorist attacks. (Complaint ¶ 47). On April 2, Chairwoman Fritz contacted the County Administrator about the deluge of correspondence, to which the County Administrator replied:

> It just keeps coming back to the same question—why is this request subject to more scrutiny and tighter interpretation of the policy than all the past requests?

(Complaint ¶ 48). Chairwoman Fritz agreed that "the scrutiny is unfair" and hoped that the County Administrator would be prepared to answer questions to help "keep the grandstanding to a minimum." (*Id.* ¶ 49). She advised the County Administrator that "Board members are being

– 6 –

drilled by these folks and taken to lunch I hear so these are the questions and/or comments [Board members] will be making in order to answer to those folks." (*Id.*).

The Board considered the ICC's application on April 5. Prior to discussion, the County Administrator read a prepared statement observing that:

- the ICC was an eligible applicant under state law;

- historically, the County's practice generally required applicants to show proof from the health department of no other viable septic alternative;

- the ICC provided letters from the health department saying that the soil would not support traditional septic drainage, and the letters did not identify any other viable alternative;

- County staff's review of records since 1995 revealed that all but one application since then had been granted;

- public utilities "could become available over the next few years, if not in the immediate future," to the Property.

(Complaint ¶ 50).

After discussion, Supervisor William C. Chase, Jr. moved to deny the permit, drawing applause from the crowd. (Complaint ¶ 51). The motion to deny the permit passed by a 4-3 vote, with Supervisors Chase, Gary Deal, Jack Frazier, and Steve Walker in the majority. Prior to their vote, Supervisors Chase, Deal, and Frazier indicated they opposed the permit because of a lack of hardship, and Supervisor Chase stated that the pump-and-haul services are used for "emergencies" rather than "a commercial or church use." (*Id.* ¶ 53).

The majority claimed the ICC had not presented a hardship because they did not yet own the Property (the ICC closed on the land two weeks later, on April 15) and there was no existing,

– 7 –

usable structure on it.  (Complaint ¶¶ 30, 54).  However, the Board previously approved applications under similar circumstances, and the Board had never denied a pump-and-haul permit for a commercial or religious use.  (*Id*. ¶ 54).

Because of the Board's vote, the ICC cannot build a mosque and its members cannot practice their religion to the fullest extent that their beliefs require.  (Complaint ¶ 55).  There is no other land the ICC can purchase in the County that meets its needs.  (*Id*. ¶ 56).

## ANALYSIS

### I.     This Case is Ripe for Adjudication.

The Constitution limits the "judicial power" of federal courts to only "cases" or "controversies."  U.S. Const. art. III § 2.  This requirement includes the concept of "ripeness," which prevents a court "from considering a controversy until it is presented in clean-cut and concrete form."  *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013).  In assessing ripeness, courts "balance the fitness of the issues for judicial decision with the hardship to the parties of withholding court consideration."  *Id*.  This hardship analysis includes consideration of the burdens imposed by a delay in deciding the case.  *See Miller v. Brown*, 462 F.3d 312, 319, 321 (4th Cir. 2006).  "A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact remains wholly speculative."  *Doe*, 713 F.3d at 758.[2]

The County contends this case is not ripe because the Board did not reach a final decision on the permit application.  (Dkt. 6 at 7–9).  To support that position, the County's moving brief cites a single Supreme Court case from 1985 dealing with the Takings Clause, in which the

---

[2]     In the context of administrative policymaking, the claim "must involve an administrative decision [that] has been formalized and its effects felt in a concrete way by the challenging parties."  *Pashby v. Delia*, 709 F.3d 307, 317 (4th Cir. 2013).

Court stated that a Takings claim is not ripe until the relevant governmental entity has made a final decision.  *See Williamson Cty. Reg'l Planning Comm'n v. Hamilton Bank of Johnson City*, 473 U.S. 172, 186 (1985); *see also Holliday Amusement Co. of Charleston v. South Carolina*, 493 F.3d 404, 406–07 (4th Cir. 2007) (holding same in Takings Clause claim; not involving RLUIPA).  From this point of law in the Takings Clause context, the County argues that it did not make a final decision on the permit.  Instead, the County casts its decision was one based on an "insufficient application," and from that point asserts that it was incumbent upon the ICC to resubmit an application (or explore some other method) rather than sue.  (Dkt. 6 at 8–9).

The County's legal argument cannot be squared with the facts alleged.  For one, the County Administrator stated on the record at the April 5 public hearing that the ICC's application satisfied the requirements of state law, as well as the County's historical practices. (Complaint ¶ 50).  And the Complaint alleges that the ICC submitted completed applications both times it received them from the County.  (*Id.* ¶¶ 35, 45).[3]

Furthermore, the facts alleged support an inference that the contemporaneous, supposed reasons for denial—the purported lack of a "hardship" on the ICC, the fact it did not yet own the Property at the time of the vote, and the fact that no structure on the Property presently existed (*see* Complaint ¶¶ 54–54)—were pretexts for religious discrimination.  A reasonable fact-finder could conclude that the denial was not based on an insufficient application or other good-faith reasons, but rather on anti-Muslim prejudice that would not evaporate simply by resubmitting a new application.  *See Moore-King v. Cty. of Chesterfield, Va.*, 819 F. Supp. 2d 604, 615–17 (E.D. Va. 2011) (explaining that *Williamson County* did not apply when facts indicated what

---

[3]     The County asserts in passing (dkt. 6 at 8 n.2) that these allegations are "clearly contradicted" by the *absence* of *other* allegations about the ICC's pursuit of "alternative" methods.  This contention disregards the *Twombly*/*Iqbal* standard and implies that the nonexistence of an allegation can override the presence of an expressly-alleged fact.

– 9 –

would occur if plaintiff pursued additional procedures), *aff'd*, 708 F.3d 560 (4th Cir. 2013); *Bikur Cholim, Inc. v. Vill. of Suffern*, 664 F. Supp. 2d 267, 274–75 (S.D.N.Y. 2009) (holding that RLUIPA claimant need not avail itself of additional procedures if they would be "futile" and that court need only locate "a final, definitive position from a local authority" for ripeness).

The relevant facts supporting this conclusion include:  the low showing required for permit approval in the past; the historically high approval rate, including to other commercial and religious entities; the atypical delay in considering the ICC's initial application; the statements by County officials that the ICC's application received heightened scrutiny; the County Administrator's prepared remarks that the ICC's application satisfied state law and local practice, and; anti-Muslim comments and pressure directed at Board members before their vote. (Complaint ¶¶ 21, 38–41, 47–51, 54).   Furthermore, the Board's decision was obviously "formalized" by its 4-to-3 vote, and "its effects felt in a concrete way by" the ICC:  At worst the complete inability to build a mosque, or at best a significant delay and added expense to that effort, either of which flowed from a purportedly discriminatory decision that substantially burdens the ICC's religious exercise. *See Pashby*, 709 F.3d at 317; *see infra* Parts III & IV.

In sum, assuming without deciding that it is proper to import the final decision standard from Takings Clause cases into RLUIPA, the facts alleged meet that standard.[4]

---

[4]     The County implies that a ripened substantial burden can never exist as long as there is some conceivable alternative option, however onerous it may be.  (Dkt. 31 at 12 ("this case is not ripe for adjudication because the ICC has several options that allow it to move forward with its religious facility")).   The Seventh Circuit considered a similar argument and rejected it as a "misreading of RLUIPA."  *Sts. Constantine & Helen Greek Orthodox Church, Inc. v. City of New Berlin*, 396 F.3d 895, 900 (7th Cir. 2005).

The Court found that a "substantial burden" can arise—thus supporting both a RLUIPA claim and its ripeness for adjudication—even in the face of other available avenues.  *Id.* at 901. The city in *New Berlin* engaged in a "delaying game" regarding a congregation's efforts to build a church.  *Id.* at 898.  Although the congregation was offered alternative arrangements or "could have searched around for other parcels," the "delay, uncertainty, and expense" of those

– 10 –

## II.     This Case Involves a "Zoning Law" or Application Thereof under RLUIPA.

RLUIPA's protections do not cover every governmental decision. Rather, they apply to a "land use regulation." 42 U.S.C. § 2000cc(a)(1), (b). That phrase, in turn, is defined as:

> a *zoning* or landmarking law, *or the application of such a law*, that limits or restricts a claimant's use or development of land (including a structure affixed to land), if the claimant has an ownership, leasehold, easement, servitude, or other property interest in the regulated land or a contract or option to acquire such an interest.

42 U.S.C. § 2000cc-5 (emphasis added). Thus, the issue is whether the County's permit approval process and decision is a "zoning law" or "application of such a law." It is.

The County views a pump-and-haul permit not as a zoning law, but as a public health law. It contends that the pump-and-haul permit process is not part of the County's formal zoning scheme. (Dkt. 6 at 6). And it observes that the pump-and-haul permit process is—at least at the highest level of abstraction—a state health law: The Complaint, for instance, alleges that the permits are ultimately "regulated by the state" pursuant to the Administrative Code and are issued by the Commissioner for Virginia's Department of Health. (*Id.* (citing Complaint ¶¶ 15, 17)).

Nevertheless, the County's process regarding approval of pump-and-haul permits is best understood as a zoning law. To hold otherwise would disregard RLUIPA's rule of broad construction, elevate form over function, and cut against case law indicating that laws applied in a manner akin to zoning laws should be understood as such.

---

alternatives—themselves necessitated by the city's original denial and obfuscations—imposed a substantial burden. *Id.* at 899, 901; *see Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 557–58 (4th Cir. 2013). City officials' vacillating recommendations and dubious legal positions during the zoning process further created "the whiff of bad faith" and an "inference [that] hostility to religion, or more likely to a particular sect, influenced the decision." *New Berlin*, 396 F.3d at 898, 900–01.

– 11 –

First, RLUIPA—in a subsection entitled "Broad construction"—commands that it "shall be construed *in favor of a broad protection* of religious exercise, to the *maximum extent* permitted by the terms of [the statute] and the Constitution." 42 U.S.C. § 2000cc-3(g) (emphasis added). This provision supplies an internal canon of construction: When the interpretation of a RLUIPA term is disputed, favor the religious claimant to the greatest extent possible. *See*, *e.g.*, *Lovelace v. Lee*, 472 F.3d 174, 186 (4th Cir. 2006); *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 289 (5th Cir. 2012).

Second, the Fourth Circuit has indicated that water and sewer regulations are "zoning laws" under RLUIPA. In *Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548 (4th Cir. 2013), a county had a water and sewer plan that did not allow public service in certain zones. A congregation applied for an exception to the plan to facilitate building a church. *Id*. at 553. After one denial, the congregation reapplied, but the county "deferred" that application after passing a new zoning law that would have prohibited the church outright within the relevant zone. *Id*. at 554. The church sued under RLUIPA, challenging both deferral of its water and sewer application and the new zoning law. *Id*.

In reversing the district court's finding that the county's actions did not impose a substantial burden, the Fourth Circuit's opinion focused mainly on the new zoning law. *See*, *e.g.*, *id*. at 557–59. But the Court also noted that the issue of "whether the County violated the law by . . . deferring [the church's] application for a private well and septic system" was properly before it. *Id*. at 554 n.2. This undercuts the County's argument that *Bethel* "clearly deals with a land use situation involving a church request for an amendment to a zoning designation, albeit one which related to that county's water and sewer plan." (Dkt. 31 at 4). As discussed above, the church in *Bethel* challenged the sewer application deferral and the new zoning law as

– 12 –

separate violations of RLUIPA; both issues were raised on appeal; and the Fourth Circuit saw no reason to distinguish between them for purposes of its RLUIPA analysis.

*Reaching Hearts International, Inc. v. Prince George's County*, 368 F. App'x 370 (4th Cir. 2010), even more clearly supports the conclusion that sewer and water decisions can fall within RLUIPA. There, like here, the zoning on a congregation's property permitted churches as of right. *Id.* at 371. But the congregation could not obtain "a change in the sewer and water classification for portions of the property," which "effectively prohibited the church's planned development of a worship center." *Id.* Analogous to this case, "[m]any other properties received approval for sewer and water reclassifications in 2003 and 2005, but Reaching Hearts—the only church property—was denied such a reclassification." *Id.* The Fourth Circuit affirmed judgment in favor of the church, holding that "the County imposed or implemented *a land use regulation* in a manner that imposed a substantial burden on Reaching Heart's religious exercise, without satisfying the standard of strict scrutiny." *Id.* at 372 (emphasis added). That is, the Fourth Circuit squarely held that the sewer petition fell within RLUIPA's ambit.

Third, the County's zoning ordinance incorporates its septic system requirements. *See Fortress Bible Church v. Feiner*, 694 F.3d 208, 217 (2d Cir. 2012) (finding RLUIPA applied to environmental law in part because it was "intertwined" with locality's zoning regulation). Section 13-1 of the County's zoning plan forbids erecting a structure "without an appropriate permit therefore."[5] The County Code, in turn, requires a person to obtain a wastewater system

---

[5]     Section 20-4-1(g) of the zoning plan also requires for approval a site plan to provide "adequate sewer facilities."

– 13 –

permit as a precondition to obtaining a building permit. Culpeper Cty. Code § 14-11. It is also illegal to use a structure that lacks "an approved method of sewage disposal." *Id*. § 14-6.[6]

In other words, the zoning laws require a building permit, which in turn is preconditioned on obtaining a septic permit—in this case, a pump-and-haul permit. Culpeper Cty. Code § 14-11 & App'x A, § 13-1. Because Culpeper County's zoning laws make it impossible to receive permission from the County to build a structure without first obtaining the necessary sewage permit (which the County here refused to grant), its permitting process is considered a "zoning law" under RLUIPA. *See Anselmo v. Cty. of Shasta, Cal.*, 873 F. Supp. 2d 1247, 1257 (E.D. Cal. 2012) (holding that building code making "explicit reference to the county's zoning laws" and that in practice "makes obtaining a permit contingent upon compliance with zoning laws" fell within RLUIPA).

Fourth, other cases indicate that treating the County's permit approval process as a "zoning law" for RLUIPA purposes is proper. For instance, the Second Circuit has looked to the functional application of a law rather than its abstract, formalistic classification when deciding whether it comes within RLUIPA. *See Fortress Bible Church v. Feiner*, 694 F.3d 208, 216 (2d Cir. 2012) (holding that, even where a law is normally concerned with environmental or health issues, it falls "within the purview of RLUIPA" when used "as the primary vehicle for making zoning decisions"); *id.* at 218 ("when a statutorily mandated environmental quality review process serves as a vehicle to resolve zoning and land use issues, the decision issued constitutes the imposition of a land use regulation as that term is defined in RLUIPA"). Holding otherwise would permit localities to make an end-run around RLUIPA's expansive protections under the guise of environmental, safety, or building code regulations. *See id.* at 218 ("We decline to

---

[6]     Violations of these provisions are criminal misdemeanors, punishable by up to a $2,500 fine, 12 months imprisonment, or both. Culpeper Cty. Code § 14-5.

– 14 –

endorse a process that would allow a town to evade RLUIPA by what essentially amounts to a re-characterization of its zoning decisions."); *Anselmo*, 873 F. Supp. 2d at 1257.

Where the record supports the inference (as the allegations do here) that a locality "disingenuously used" its procedures "to obstruct and ultimately deny" a congregation's building, courts "decline to insulate" it from "liability with regard to its decisions on zoning issues simply because it decided them under the rubric of an" ostensibly non-zoning process. *Bible Fortress*, 694 F.3d at 218 (observing that locality's own planning commissioner believed church's application did not warrant scrutiny under existing environment law, but locality still aggressively applied environmental standards and then "manipulated" the process).[7]

### III.    The County Has Imposed a Substantial Burden on the ICC's Religious Exercise.

RLUIPA prohibits the implementation or imposition of a land use regulation that "imposes a substantial burden on the religious exercise" of the ICC, "*unless* the [County] demonstrates that imposition of the burden" on the ICC furthers "a compelling governmental interest" and "is the least restrictive means of furthering that" interest. 42 U.S.C. § 2000cc-(a)(1). The County asserts that the Complaint does not show the imposition of a substantial burden on the ICC's religion. (Dkt. 6 at 9–10). There are several problems with that position.

The first shortcoming is that the point was insufficiently raised and thus waived. The County's moving brief devotes barely a page to the matter. It does not cite a single case or legal

---

[7]    The County relies on an unpublished Third Circuit decision where a locality's "mandatory tap-in" law required buildings within 150 feet of a municipal sewer system to connect to it. *Second Baptist Church of Leechburg v. Gilpin Twp, Pa.*, 118 F. App'x 615 (2004). The church refused to comply due to prohibitive costs. The Third Circuit affirmed dismissal of the RLUIPA claim because the tap-in law was not a zoning regulation. Even if it were binding authority, *Second Baptist* is distinguishable from this case because—as explained above—(1) the sewage permit is a prerequisite for a building permit, which is required under the County's zoning law, and (2) the facts alleged support the conclusion that the County used the permit process in a discriminatory, pretextual way to effectively "zone out" the ICC's mosque.

– 15 –

authority in support of its "argument." Nor does the brief cite, discuss, or analyze the Complaint's allegations, aside from a dismissive mention of Paragraph 55, which the County—ignoring the *Twombly/Iqbal* standard—says has "no merit." (Dkt. 6 at 10).

Nevertheless, the Complaint shows a substantial burden on the ICC's religious exercise. It alleges that, because of the permit denial, the ICC members cannot construct a mosque and adequately practice their religious beliefs. (Complaint ¶¶ 27, 55). RLUIPA defines "religious exercise" to include the "use, building, or conversion of real property for the purpose of the religious exercise" for the people or entities that use or intend to use the property. 42 U.S.C. § 2000cc-5(7)(B). Further, "in the land use context, a plaintiff can succeed on a substantial burden claim by establishing that a government regulation puts substantial pressure on it to modify its behavior." *Bethel World Outreach Ministries v. Montgomery Cty. Council*, 706 F.3d 548, 556 (4th Cir. 2013). Given that the zoning map of the Property permits religious uses as of right, the denial of the permit and resulting inability to construct a mosque imposes a substantial burden on the ICC's religious exercise.

The County writes that the ICC had other options available, such as resubmitting an application, looking at "alternative septic systems," and trying to obtain a pump-and-haul permit directly from the State. But all of these actions are substantially burdensome, especially when compared to the traditional ease of obtaining a permit. *See Bethel*, 706 F.3d at 557–58 (holding that considerable evidence that current facilities inadequately serve religious needs is sufficient to show substantial burden, as is "delay, uncertainty, and expense").[8]

---

[8] After failing to develop its position initially, the County presented several arguments in its reply. *See Goldsboro City Bd. of Educ. v. Wayne Cty. Bd. of Educ.*, 745 F.2d 324, 327 n.3 (4th Cir. 1984) (describing practice of "sandbagging"); *Sparkle Hill, Inc. v. Interstate Mat Corp.*, 788 F.3d 25, 29 (1st Cir. 2015). Even if properly before the Court, the arguments fail.

The County tries to distinguish *Bethel* by arguing that it "did not force the ICC to modify

– 16 –

**IV.     The Allegations Are Sufficient to Show Religious Discrimination.**

Finally, the County posits that the Complaint does not sufficiently allege a violation of RLUIPA's "nondiscrimination" provision.   (Dkt. 6 at 11).    Under that subsection, "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination."  42 U.S.C. § 2000cc-(b)(2).  The County—citing the Fourth Circuit's *Bethel* decision—claims the Government failed to allege facts showing that the permit denial was based on the fact that ICC is a religious organization.  *See* 706 F.3d 599–600.

This case is distinguishable from *Bethel*.   There, the religious claimant did not provide evidence either that the locality acted against it because of its religious status, or that the reasons for the locality's actions were pretextual.   *Bethel*, 706 F.3d at 600.   Here, however, the allegations and reasonable inferences support both conclusions.  As discussed above:  (1) the County historically granted permits as a matter of course and subjected applications to minimal

---

its ability to build a mosque or sell the property."  But this misapprehends the nature of a substantial burden. The ICC planned to build a mosque.  The County delayed and frustrated that plan, thus imposing a substantial burden.  *See supra* footnote 4.

The County avers that there is no "pattern of action" targeting the ICC.  Yet the County cites no authority holding that a "pattern" is required to prove a substantial burden.  *See* 42 U.S.C. § 2000cc(a)(1) (forbidding even "a" land use law imposing substantial burden).

Consider, also, the following:  the low historical bar for granting permits; the minimal scrutiny of previous applications; anti-Muslim comments and pressure directed at the Board; statements by the Board Chairwoman and County Administrator that the ICC's application received heightened scrutiny; and the County Administrator's remarks that the ICC met state and local standards.  These allegations support the conclusion that (1) postponing consideration of the ICC's first application; (2) making the ICC fill out a second one, and; (3) denying the second application, constituted a pattern of religiously-motivated action against the ICC.

Lastly, the County argues the ICC created a self-imposed hardship.  *See Andon, LLC v. City of Newport News*, 813 F.3d 510 (4th Cir. 2016).  But the County relies on extrinsic evidence filed with its reply brief that the Court need not consider now.   Additionally, *Andon* is distinguishable, because the ICC had the Property under contract and had no reason to think it would not be allowed to construct a religious building.  *Compare Andon*, 813 F.3d at 515.  In fact, the ICC had a reasonable expectation that it could use the land for religious purposes, as the zoning map permits religious uses on the Property as of right.

– 17 –

review; (2) prior permits were granted to religious and secular organizations alike; (3) when local citizens and officials became aware of the ICC's application, the scheduled hearing was abruptly postponed; (4) the County then subjected the ICC's application to an atypically thorough examination; (5) some County officials believed this heightened scrutiny was attributable to the ICC's religious status and beliefs; (6) the ICC's application satisfied state law requirements and the County's historical criteria, and; (7) there was a nontrivial amount of public anti-Muslim sentiment regarding the application, which was communicated by constituents to Board members before their vote. (Complaint ¶¶ 21, 38–41, 47–51, 54). The Complaint thus contains far more than "sheer speculation" of religious bias, as the County contended at oral argument.

Construed in the light most favorable to the plaintiff, the above facts support the conclusion that the ICC's religion motivated the County's permit denial. *See Bethel*, 706 F.3d at 599 (citing *Sylvia Dev. Corp. v. Calvert Cty.*, 48 F.3d 810, 819 (4th Cir. 1995) for proposition that "sequence of events leading up to a challenged decisions [i]s probative of whether the decision-making body was motivated by discriminatory intent")).

The County focuses on other allegations in the Complaint that it says show a nondiscriminatory basis for the denial: health concerns and a supposed lack of hardship. (*E.g.*, Complaint ¶¶ 53–54). But the same facts recounted above supply an inference of pretext that is sufficient to overcome these ostensible, facially-neutral reasons. *See Bethel*, 706 F.3d at 560 (citing authority indicating that a county's departure from normal procedures, low ratio of prior permit denials, and anti-religious statements by community members and county officials were sufficient to establish pretext and a finding of intentional discrimination); *see also Marks v. City of Chesapeake, Va.*, 883 F.2d 308, 313 (4th Cir. 1989) (affirming verdict that city's zoning vote against fortune teller was "impermissibly tainted by irrational neighborhood pressure manifestly

– 18 –

founded in religious prejudice"); *id*. at 311 ("As a general matter, therefore, the public's negative attitudes, or fear, unsubstantiated by factors which are properly cognizable in a zoning proceeding, are not permissible bases for local officials' land use decisions"), 312 (finding it "clear" that permit denial grounded "solely in an effort to placate those members of the public who expressed 'religious' objection to the plaintiff's proposed use of his property" is arbitrary and capricious).

Finally, the County submitted transcripts from the Board meeting in question. These materials should not be considered. First, they were attached to a reply brief rather than in the County's moving brief, thus denying the Government the opportunity to respond. Second, since this is a motion to dismiss, the submission is arguably improper. Third, if the Court took judicial notice of the transcripts, it would still be obliged to construe them in the light favorable to the plaintiff. *Zak v. Chelsea Therapeutics Int'l, Ltd.*, 780 F.3d 597, 607 (4th Cir. 2015). Even considering the materials, they would create merely a factual dispute, providing the County with some evidence against the Complaint's numerous allegations supporting its claims.[9] This conflict, of course, would not be grounds to dismiss the Complaint under the *Twombly/Iqbal* standard.

### SUMMARY

The Court concludes that this case is constitutionally ripe for decision, and that the County's decision was a land use regulation within the meaning of RLUIPA. Moreover, the

---

[9]     For instance, the County argues that the meeting minutes reveal that the reason for the delay in considering the ICC's initial application was because the County Attorney legitimately needed time to conduct a legal review. While the County Attorney's statements at the meeting may be a fact for a jury to consider, it does not overcome—as a matter of law—the other facts and inferences alleged in the Complaint. Indeed, the statement merely creates a factual dispute about whether the delay was pretextual or not, which of course at this stage must be decided in the Government's favor.

United States has alleged facts sufficient to support its substantial burden and nondiscrimination RLUIPA claims against Culpeper County. Accordingly, the County's motion to dismiss will be denied. An appropriate order will issue.

The Clerk of Court is directed to send a copy of this opinion and the accompanying order to counsel of record.

Entered this 29th day of March, 2017.

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE